DAVID HOROWITZ, Plaintiff-Appellant, v. RICK BAKER *et al.*, Defendants-Appellees.

Third District   No. 3—87—0478

Opinion filed April 29, 1988.

Gary D. Nelson, of Heyl, Royster, Voelker & Allen, of Peoria (William I. Covey, of counsel), for appellant.

Mary W. McDade, of Quinn, Johnston, Henderson & Pretorius, of Peoria (R. Michael Henderson, of counsel), for appellees.

JUSTICE SCOTT delivered the opinion of the court:
This cause comes on appeal from the trial court's dismissal of plaintiff's second amended two-count complaint alleging libel based upon an article written by defendant Rick Baker and published by defendant The Peoria Journal Star, Inc. The trial court ruled that the statements complained of by plaintiff were statements of opinion, not fact, and that plaintiff's second amended complaint failed to allege sufficient facts to establish that the statements complained of were false.

The procedural issue before the court is whether the trial court erred in dismissing plaintiff's second amended complaint with prejudice.

Plaintiff alleged that he was in the business of comparing product performance with its advertisements and advising the consumer of those goods the results of his comparison; further, that he has a nationally syndicated television show, newspaper column and was nationally known as a person of good name and repute, personally and in his profession, and was held in high esteem by and among his contemporaries, acquaintances and the general public.

Plaintiff stated that prior to October 26, 1984, defendant Rick Baker (Baker) composed and wrote an article (the article) for publication in The Peoria Journal Star (PJS) which was published by PJS on October 26, 1984. We will not go into detail as to the contents of the article as it is printed in full in the appendix of this opinion. For the most part, the article criticizes the subject matter of plaintiff's own consumer programs and his method of presentation on those programs. The article, however, also speaks rather harshly of a transaction wherein plaintiff purchased some bricks from the City of Peoria with the assistance of the former mayor, Richard Carver. Plaintiff contends that the article complained of is false and defamatory in that it implies that plaintiff unlawfully obtained bricks from the City of Peoria at a price cheaper than did any other prospective purchaser of these bricks from the city.

In particular, plaintiff's second amended complaint contains the following allegations:

"5. The statements in said articles which were false and defamatory were:

(a) That Richard Carver planned to secretly and cheaply sell public bricks to the plaintiff, David Horowitz, and in so doing grant Horowitz a benefit not available to others; said statement was false and defamatory in that the sale of the bricks to the plaintiff by the City of Peoria was not done 'secretly' as the sale was discussed in an article appearing in the Peoria Journal Star on Wednesday, October 24, 1984. A true and correct copy of that article is attached hereto. The article was false and defamatory because the City of Peoria did not sell the bricks to the plaintiff 'cheaply' as the plaintiff paid the identical purchase price as other purchasers of the bricks.

(b) That Carver and Horowitz had a 'cozy little deal with old bricks left over from downtown development,' thereby accusing plaintiff of wrongfully or unlawfully bidding on and re-

ceiving public property or receiving the property at a lower price than others. Said statement was false and defamatory in that sale of the bricks had been previously reported in the Peoria Journal Star and plaintiff paid the same amount for the bricks as other purchasers.

(c) That Carver and Horowitz 'were trying to pull a fast one,' accusing the plaintiff of wrongfully or unlawfully bidding on or receiving public property or receiving the property at a lower price than others. Said statement was false and defamatory in that plaintiff paid the same purchase price for the bricks as other purchasers of the bricks.

(d) That Carver and Horowitz arranged to have public property funneled to Horowitz for very little money, accusing the plaintiff of participating in or being part of a conspiracy to unlawfully or improperly bid on and receive public property or receive a benefit not available to others. Said statement was false and defamatory in that plaintiff paid the purchase price paid by other purchasers.

(e) That the transaction, in which Mayor Carver bid on the bricks for Mr. Horowitz, constitutes a 'rip off'. Said statement was false and defamatory in that plaintiff paid the purchase price paid by other purchasers."

Defendants filed a "hybrid" motion which the parties agreed would be viewed as a motion pursuant to section 2—615 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—615) challenging the legal sufficiency and seeking a dismissal of the second amended complaint. Basically, defendants assert that the alleged statements in paragraphs 5(a) through (e) above were either not published, not defamatory without further amplification, capable of innocent construction or were fair comments on a public offering. Defendants also refuted plaintiff's assertion that the statements were libel *per se*, thereby arguing that plaintiff must allege actual damages.

The trial court applied the innocent construction rule and found, first, that the statements were constitutionally protected expressions of opinion and as a matter of law could not form the basis for a defamation action and, second, that the second amended complaint did not plead sufficient facts which, if proven, would establish that the statements were false. We will not comment on the trial court's second reason for dismissal as we believe that the statements are expressions of opinion, reasonably susceptible to innocent interpretation and, thus, not actionable.

■ Without going in depth, we note the United States Supreme

Court has recognized that expressions of opinion are constitutionally protected privileges. (*Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997; see also *Owen v. Carr* (1986), 113 Ill. 2d 273, 497 N.E.2d 1145, 1148.) Whether an expression is one of opinion or fact is a matter of law. *Lewis v. Time, Inc.* (9th Cir. 1983), 710 F.2d 549.

■ In *Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 970, *cert. denied* (1985), 471 U.S. 1127, 86 L. Ed. 2d 278, 105 S. Ct. 2662, the court developed the totality-of-the-circumstances analysis to serve as a guideline in determining whether alleged defamatory statements are privileged expressions of opinion or actionable statements of fact. (*Ollman*, 750 F.2d at 980.) In *Stewart v. Chicago Title Insurance Co.* (1987), 151 Ill. App. 3d 888, 503 N.E.2d 580, the court interpreted those guidelines as:

> "The first test is whether the common usage or meaning of the specific terms or language has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite or ambiguous. The second test requires the court to look at the defamatory statement from the viewpoint of a reasonable reader to determine if that reader believes the statements to have a specific factual content making it believable. The third test requires that the court consider the full context of the statement to see if the surrounding language will influence the average reader's readiness to infer that a particular statement has factual content. The fourth test requires the court to consider the broader context or setting in which the statement appears, specifically the type of writing in which the statement is found and the people to whom the writing is distributed." *Stewart*, 151 Ill. App. 3d at 893-94, 503 N.E.2d at 583.

The above analysis is not a precise formula which must be "undertaken in a rigid lock-step fashion." *Ollman*, 750 F.2d at 980 n.17.

The innocent construction rule was first adopted *obiter dictum* in *John v. Tribune Co.* (1962), 24 Ill. 2d 437, 181 N.E.2d 105, *cert. denied* (1962), 371 U.S. 877, 9 L. Ed. 2d 114, 83 S. Ct. 148. The rule was later modified in *Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 350-51, 442 N.E.2d 195, wherein the court stated:

> "We therefore hold that a written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone

other than the plaintiff it cannot be actionable *per se.* This preliminary determination is properly a question of law to be resolved by the court in the first instance; whether the publication was in fact understood to be defamatory or to refer to the plaintiff is a question for the jury should the initial determination be resolved in favor of the plaintiff." 92 Ill. 2d at 352, 442 N.E.2d at 199.

We believe the trial court improperly used the innocent construction rule in deciding that the statements complained of were expressions of opinion. Our review of Illinois law indicates that the innocent construction rule stated above is a distinct legal doctrine for determining whether statements, as a matter of law, are actionable *per se. (Chapski,* 92 Ill. 2d at 350-51, 442 N.E.2d at 199; *Bruck v. Cincotta* (1977), 56 Ill. App. 3d 260, 371 N.E.2d 874.) Whether statements are to be construed as expressions of opinion is a separate test apart from the innocent construction rule. Nonetheless, we agree with the trial court's order dismissing plaintiff's second amended complaint, with prejudice, for two reasons. First, the statements are expressions of opinion, not of fact, and are therefore constitutionally protected. *(Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997; *Owen v. Carr* (1986), 113 Ill. 2d 273, 497 N.E.2d 1145.) Second, the statements are reasonably susceptible to an innocent construction. *Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 442 N.E.2d 195.

Plaintiff's primary argument, citing *Catalano v. Pechous* (1980), 83 Ill. 2d 146, 419 N.E.2d 350, is that the article implies plaintiff received some benefit not otherwise available to the public and, therefore, was involved in some wrongdoing or cheating of the public. In *Catalano,* the supreme court concluded that an accusation of a specific criminal behavior is a statement of fact and not a constitutionally protected expression of opinion. *(Catalano,* 83 Ill. 2d at 162, 419 N.E.2d at 359.) The court also stated that the accusations need not charge the criminal offense with the precision of an indictment. *(Catalano,* 83 Ill. 2d at 156, 419 N.E.2d at 355.) Plaintiff, here, asserts that defendant's use of the words "sleazy," "cheap," "pull a fast one," "secret," and "rip-off" imply that the plaintiff obtained property from the City of Peoria in an unlawful manner. We disagree.

*Catalano* involved a situation where a city clerk, in response to the city council's authorization of a city garbage collection contract, stated "(t)wo hundred forty pieces of silver changed hands—thirty for each alderman." *(Catalano,* 83 Ill. 2d at 156, 419 N.E.2d at 352-53.) In *Catalano,* the court distinguished *Greenbelt Cooperative Publishing*

*Association v. Bresler* (1970), 398 U.S. 6, 26 L. Ed. 2d 6, 90 S. Ct. 1537, wherein the United States Supreme Court stated that defendant's use of the term "blackmail" to describe the plaintiff's dealings with the City of Greenbelt did not charge the plaintiff with a crime, as "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable." (*Greenbelt*, 398 U.S. at 14, 26 L. Ed. 2d at 15, 90 S. Ct. at 1542.) The *Catalano* court stated:

> "In *Greenbelt* the word 'blackmail' was used to convey the speaker's negative evaluation of conduct by the plaintiff which was known to both the speaker and his audience. In the case before us Pechous' charge of bribery, while of course it evidences his disapproval of the award of the contract, also informs his audience that a criminal act of which the audience was unaware has been committed by the aldermen." *Catalano*, 83 Ill. 2d at 162, 419 N.E.2d at 358.

We view the present situation as being more akin to *Greenbelt* than *Catalano*. Here, defendant was not informing his audience of a criminal act which his audience was unaware had been committed. A previous article, published by The Peoria Journal Star on October 24, 1984, indicated that the bulk of bricks being sold by the city were bid for by Mayor Richard E. Carver "for a friend." Further, the bricks were being sold for 25 cents each to plaintiff. The public was already aware of the events that had transpired; Baker's article was merely his impression of the manner used by Mayor Carver and plaintiff in obtaining the bricks. We perceive Baker's use of the terms "sleazy," "cheap," "pull a fast one," "secret," and "rip-off" to describe the transaction as no more than "rhetorical hyperbole."

As further support, section 566 of the Restatement (Second) of Torts states:

> "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." Restatement (Second) of Torts §566 (1977).

By prior articles, the public was aware of the facts upon which Baker expressed his opinion. In fact, Baker's first sentence of his article states, "Now that we know to whom Richard Carver planned to secretly and cheaply sell public bricks ***," thereby acknowledging that the underlying facts were known by the public.

Additionally, using the totality of the circumstances test an-

nounced in *Ollman*, we consider the language used by defendant Baker to describe the transaction as incapable of precise meaning in this given context. A reasonable reader would not construe Baker's terminology to have specific factual content. Moreover, the context of the article and the broader social context within which the statements were made lead us to the conclusion that an average reader would not regard the statements as factual reporting, but only as the author's personal distaste for a specific transaction involving a proclaimed consumer advocate and the mayor of a depressed city. We do not, however, rule out the possibility that this same language would, in another context, be the basis for a successful defamation suit.

■ We further believe that the language used by the defendants may reasonably be innocently interpreted under *Chapski* and, therefore, not actionable. Here also, the statements must be considered in context with words and implications given their natural meaning. (*Chapski*, 92 Ill. 2d at 352, 442 N.E.2d at 199.) Although we find it difficult to interpret the meanings of the words used by Baker, the implication derived from the article is not that an unlawful act was committed, but that a consumer advocate was using his association with an old college friend to obtain bricks for use in a private project. Baker implies that this contrasts with plaintiff's image as a consumer advocate. Therefore, we do not consider Baker's statements as actionable *per se*.

Although we do not condone Baker's method of presentation or his word choice, we believe that the statements made are merely opinion, regardless of whether Baker's characterizations are unwarranted and distasteful. Plaintiff has not used the proper forum for refutation of Baker's opinion.

Subsequent to the drafting of this opinion but prior to the filing of the same, the defendant Rick Baker departed this life on March 4, 1988.

For all of the foregoing reasons, we affirm the trial court's order dismissing plaintiff's second amended complaint with prejudice as to both defendant Baker and defendant Peoria Journal Star.

Affirmed.

HEIPLE and BARRY, JJ., concur.

JOURNAL STAR, Peoria, Friday, October 26, 1984  A3

# So much for Horowitz's consumer advocacy

**RICK BAKER**

Now that we know to whom Richard Carver planned to secretly and cheaply sell public bricks, an even sleazier ingredient is added to an already shabby stew.

The planned recipient of the bricks (which former Mayor Carver had asked the council to allow him to sell cut-rate to an anonymous buyer as "a personal favor") is David Horowitz.

Horowitz, as you may know, is the Howard Cossell of consumer writers — a man who speaks in exclamation points and self-righteously makes big deals out of very small ones.

And it's obvious why Carver and Horowitz, old college chums, were trying to keep their cozy little deal with old bricks left over from downtown development as low key as possible.

These two noble beings — these champions of the people and protectors of the underdog — were trying to pull a fast one so Horowitz could build a slick patio or sidewalk or something for his posh digs in California.

Learning Horowitz is the guy Carver got the bricks for is sort of gratifying — it's kind of like learning that holier-than-thou TV preacher is actually a child molester.

Horowitz (who I think was the role model for the Saturday Night Live skit The Whiners — that gripe-about-anything couple who've nauseated a nation) has given the noble craft of consumer writing a bad name.

The last time I saw one of his television shows, he was howling about pantyhose. Some pantyhose company advertises its pantyhose tingle and massage your legs while you walk.

Apparently Horowitz was out shopping for pantyhose and insisted on trying a pair out before buying. (He seems like the kind of guy who would insist on that.) And apparently his legs didn't feel massaged or tingly.

So he gets on TV and starts screaming stuff like: YOU LIARS. YOU CHEATS. YOU WHORES. RIP OFF. RIP OFF. RIP OFF. FIGHT BACK. YOU FOOLS WHO ACTUALLY BELIEVE PANTYHOSE HAVE FINGERS.

And all of America sits in their easy chairs and thinks: What a jerk.

In a world of real problems, where a real consumer advocate like Ralph Nader can do tremendous good, Horowitz is the kind of guy who gets by trying to prove Rice Crispies may snap, they may crackle, but they don't pop.

One can almost hear him yelling: Snap, I'll buy. Crackle, I'll concede. But pop, no way. YOU LIARS. RIP OFF. FIGHT BACK.

Most of his consumer advice is so inane, so obvious, it's insulting. I can easily imagine Horowitz yelling: IF YOUR BUTCHER GIVES YOU A ROAST WITH TOO MUCH FAT, TELL HIM YOU DON'T WANT IT. FIGHT BACK.

And in Horowitz's line of reasoning, you don't just ask the butcher for another roast. You beat him over the head with the fat one, yell RIP OFF, then send him away to the attorney general.

It's also real big on giving advice which is instinct to anyone over eight: When you buy all those records for a penny, more records will come and cost more than a penny. RIP OFF. FIGHT BACK.

Every time I see Horowitz, he looks desperate for a real story — something he can really sink his teeth into.

Here's a good lead, David Horowitz.

Once there was a mayor of a de———ssed Midwestern city who funneled˺ ˏblic property to a nationally known ˅ ˏmer writer for very little money.

The mayor wouldn't tell anybody who h. was funneling the property to, though, protecting the consumer writer's reputation as a straight-forward, public-loving kind of guy.

Pretty good, huh Dave?

RIP OFF. RIP OFF. FIGHT BACK.